Good morning, everyone, and good morning to the members of the Federal Circuit, the police and the city, and good morning to the courthouse. This is a morning hearing of a regular array of cases that we would otherwise be hearing in Washington. We thank the good offices of the Chief Judge of the District Court and of the Court of Appeals for the Second Circuit and the Circuit Executive for great assistance in facilitating our visit here. Another panel is sitting simultaneously in another courtroom in this courthouse, but also hearing a normal array of cases. This panel has reported a total of six cases. Three are being submitted today on the briefs. Without more argument, they are Appeal Number 2007-7052, Wall v. Department of Veterans Affairs. Appeal 2007-3112, Harvey v. United States Postal Service. And Appeal 2007-3240, Tribune v. Office of Personnel Management. The argument consists of three cases, the first of which is Brace v. United States, Appeal Number 2007-5002. Your argument, Mr. Devlin. Good morning to you. Welcome. Please proceed. Good morning, Your Honors. May it please the Court. I'm Neil Devlin, representing Robert Brace in this matter. Your Honor, subject to any questions the Court may have, I'd like to focus my oral argument on what we believe to be three of the determinative issues in this case. The first of those is whether the trial court error in concluding that the consent order, as a consent order, cannot result in a taking. The second issue is whether the requirements imposed upon Mr. Brace under the consent order constitute a physical taking. And the third is whether the trial court error in concluding that the combination of what's referred to as the Homestead and Murphy farms is the relevant parcel and the parcel as a whole under the regular court takings analysis. Do you agree that on all three of those issues that they are fact-driven and that the applicable standard of review for us would require a determination of clear error before we could reverse them? Your Honor, I believe that they are mixed questions of fact and law. There are certain factors. Do you support your authority for saying that the three questions you pose are mixed questions as opposed to clear error of fact questions? Well, Your Honor, with respect to whether or not the consent order can constitute a taking, I think that the question becomes whether or not it was a result of required acquiescence. That is a legal question. It has factual underpinnings. My question was, what is your authority for your assertion? Your Honor, I believe in our brief we indicate the authority for the consent of the takings are legal questions with factual underpinnings. Of course, we all agree on that. The three specific questions you're posing look to me like they fall in the fact category, not the ultimate question, which is law. Your Honor. Your Honor, you seem to be disputing that. To the extent that you dispute that, I'm asking you to cite some authority that supports your position that these three questions are legal, de novo review questions, not deferential fact review questions. And, Your Honor, I do not have any authority to cite you on that point. If I may follow up on that question, I do not believe that the facts necessary to resolve these three issues are being disputed. In fact, there are a lot of colors beyond the facts as found by the trial court and the third survey underlying my analysis. But the fact is a fact. It's been disputed that he agreed to the consent decree. It was a consent decree. He agreed to settle this case. So that was a voluntary action. How could that be taken? Your Honor, in our brief research, we saw the case which I understand is a court of federal claims case. And obviously, it's not binding on this court. But I believe the analysis there is directly applicable here. At the essence, we are dealing with a required acquiescence. And certainly, acquiescence at a certain point is going to have a voluntary component. I have to render into that consent decree. I do not agree. Your Honor. He could have accepted the result of the third circuit. And then, soon, the federal claims were made. Isn't that correct? Your Honor, he could have. But the third circuit's decision was very clear and very limited as to what the district court had left to do. The third circuit found that Mr. Royce had violated the Clean Water Act and would be subject to penalty as a result of that. The third circuit also began to determine whether or not Mr. Royce had violated previous administrative orders issued by EPA. Those administrative orders, as indicated in the third circuit opinion, included the requirement that he remediate his problem. Therefore, in coming back, and Mr. Royce attempted to reverse that decision by petitioning for a written certiorari with the Supreme Court, which was denied. In coming back to the district court, Mr. Royce was faced with the situation where there was an order from the third circuit instructing the district court that you will assess civil penalties against him for the Clean Water Act. And you will determine whether or not he's violated the administrative orders, which include the obligation to restore. At that point, if Judge Lori is correct that the consent order was voluntarily admitted to him, he didn't have to do that. He could have just accepted the judgment of the third circuit confirmation and remand and proceeded accordingly. Your Honor, if I may answer your question by relying, just talking a little bit about Scogin, because I believe it impresses upon my argument. In Scogin, there was a district court order that ordered the claim to grant the Environmental Protection Agency access to his property. In Scogin, the plaintiff decided that after that order, admitted to a voluntary lease with the EPA's primary contractor to grant them access to the property in exchange for a rental payment. The government in Scogin is making the exact same argument it's making here, which is that because that lease was voluntary, certainly plaintiff in Scogin was not compelled under contractual concepts of duress or compulsion to sign a bill. Your Honor, if you've admitted that the authority of persuasion doesn't bind us, not a very strong authority, it seems like you need logic on your side to persuade us. What is the logic to saying it was an involuntary act to agree to this consent decree when he was faced with a requested fine of $125,000 and the compromise embodied in the consent decree involved a fine of only $10,000? It looked like he made a rational choice to have a much lighter fine by agreeing to do the remediation than the size of the fine he might otherwise have faced. Why isn't that entirely voluntary and quite sensible? Your Honor, I do not disagree that Mr. Grace voluntarily put his name on it or acted in Scogin's attorney voluntarily put his name on the consent order. The question is, what were the facts and circumstances under which Mr. Grace did that, and that's established by the procedural history. There was no question after the Third Circuit's decision and after the Supreme Court refused to review it that Mr. Grace was going to be required to remediate his fine. There's no question. That was a requirement under the administrative orders that the EPA issued, and he was found to have possibly violated those orders while away. So at that point, on the remediation issue, Your Honor, I do not dispute that if we were coming towards the courts and asked for the $10,000 back, that Mr. Grace struck a deal with the panel to try to cap what could have been. Why isn't it equally true that the remediation steps were set forth in the consent decree? If he thought they were excessive or things that he couldn't agree to, his proper option was to say, no, thanks, EPA. I'm not willing to take those steps. They're excessive, and I'm going to convince the judge that they're excessive, and then we'll have a court determination of what remediation steps truly are required. But he didn't do that. He agreed to take the steps that had been set forth. Your Honor, my answer to that is it is not at all clear from a third-service opinion that the district court was entertained whether or not the remediation steps were reasonable. The remediation, as I believe the record establishes, EPA presented a restoration plan. It was not negotiated by Mr. Grace. It was given to him, and he acted as in it. The district court- He had an alternative. The alternative was to litigate it and have a different plan that he would have to follow. He chose not to litigate it, to forfeit the chance to get a different plan, and to accept the remediation plan as proposed by EPA. It was an entirely voluntary agreement. Respecting your Honor- It was a harsh choice, of course, because he was in a harsh circumstance, but that doesn't make it involuntary. Respecting your Honor, I disagree that he had a choice. The district court was charged to determine whether or not he would be assessed penalties for the violation of the Clean Water Act and whether or not he would be penalized for violating the administrative order. The EPA is the one that puts forward the administrative order. The district court normally found that if Mr. Grace, in the first instance, had acted out of conviction, but not the next time, it was probably because of the EPA. Mr. Devlin, moving on to the next issue, we can assume that you don't lose on that. I told you to lose on the denominator of the issue. Sir, I was afraid you were trying to take this concern. There was a large body of land here, which was all bought together. There was a decision together. And whatever the effect is on this particular property, the overall piece of property still has substantial value. You lose on that issue. Your Honor, I respectfully disagree that we lose on that issue, because I believe the parcel of the property defined should either be a 30-acre site, or it should be a 51-acre property farm. What they acquired in a single conveyance. This is recited in the claims court opinion. And I haven't heard that it was a million dollars in single consideration, $170,000 for a single deed. All of that is true, Your Honor. Is it also true that it was farmed as an integrated farming unit? Your Honor, that gets to the precise issue. The third circuit found that it was not. When Mr. Grace was up on the enforcement, he was seeking a normal farming exemption to the Clean Water Act. As part of that, that's clearly the beginning of the third circuit's decision. The third circuit had to decide what the relevant area was to determine whether there were normal farming activities that were ongoing. Mr. Grace argued that the farming that had occurred on the upland portions of the Murphy Farm and on the Homestead Farm, and considering the fact that it had an integrated drainage system. We're not reviewing the third circuit. We're reviewing Judge O'Leary's decision for the court federal claim. I do not disagree, Your Honor. I see that very well. I would, at all times, if I may, complete my answer. There's no question. We are not asking you to review the third circuit's opinion. But the third circuit made a decision that bound Mr. Grace. The third circuit told Mr. Grace- We are reviewing whether Judge O'Leary correctly considered the parcel as a whole to be the two side-by-side farming plots, known as the Homestead and the Murphy. And you're saying no, we should only be looking at the Murphy. That's correct. And I don't understand how that can be true when they were operated as an integrated farming operation by the Supreme Court. Your Honor, the reason it can't be true- And again, I'm not asking this court to review the third circuit's opinion. I take the answer back. But Mr. Grace sought the benefit of the Homestead Farm. He sought to say these are money and a normal farming exemption should be applied. The third circuit found that that was not accurate. That Mr. Grace would only get the benefit of what he had done on that site. Now we move to the taking side of this. And Mr. Grace is told, despite the fact that the third circuit did not consider what you had done on the Homestead Farm to determine whether or not you were exempt, whether you were engaged in normal farming activities, you now have to include the value of that in whether or not there's a regulatory taking. This is not unlike the Lovelace case in which, in order to develop a property or plant, had to convey 38.5 acres, which had been acquired at the exact same time for single consideration, had to convey that for public use. The government argued that the entire 51-acre parcel, including that 38.5 acres, should be included. The court found that was not accurate because to acquire a property, to devote a portion of the property to you, would lack depriving of the benefit of that property in one part of the development analysis. And it required them to include it in the denominator question in the parcel as a whole. On the taking side of this, it's simply unfair. And it goes precisely against that. In that case, the land had changed over the course of many years due to different size of parcel. In our case, it was the same 334 acres at every point in time. When his father farmed it, when he farmed it, when the EPA got in the picture. And they're accurate. So that case is not at all similar to that. I do not respect and, Your Honor, I disagree because Mr. Graves, like the claimant in that case, has been deprived of benefit of the Homestead Farm and Appliance and Water. He has told me we can't, we will not consider what we've done on these adjacent farmlands. But now we're taking this, but we're going to consider that relevant parcel in determining whether or not you've had a regulatory taking occur. I see I'm out of time. Mr. Devlin, I have one question regarding the potential physical taking of that land. What kind of evidence was submitted to establish the physical taking? Was there any causal evidence to show that the flooding was caused by the land? Well, I believe, Your Honor, that Mr. Graves testified to the fact that, well, there are two points, Your Honor. In 1979, the property was dry. That's clear from the trial court's opinion that that's established. And Mr. Graves then testified that after engaging in these restoration efforts, the water table rose to the point where there's now a pond. Whether or not there's a pond, I believe, is a bit of a red herring. Because I don't believe Mr. Graves needs to establish that the restoration efforts alone caused the pond. If the restoration efforts caused any level of wetness in the site, that would be a condition that is not present in 1979. The purpose of the amendments to the enforcement action and the express purpose of the restoration was to bring it back to 1984. So it's clear that the restoration efforts, because they caused wetness, based upon Mr. Graves' testimony, because they caused any level of wetness, expanded on the enforcement. And that is why we respectfully disagree with the trial court that we are now separate as between a permitting analysis and an enforcement analysis. What difference does it make- There was no other evidence establishing the causation, except for Mr. Graves' testimony. No, Your Honor. The evidence that he gave never went back. Mr. Graves is not an expert. He's a testified position. That's accurate. What difference does it make to him as a crop farmer? Whether the 30 acres in dispute is covered by a foot of water or an inch of water or simply too much to grow crops in, what difference does it make? You're going to be eating. Good and great traditions that made it croppable, when they made them restored to less land, it was no longer croppable. So what difference does it make how much water is on it? The practical impact on him is that he couldn't grow crops there anymore. Your Honor, the impact on Mr. Graves- And I see that I'm out of time, so I'm going to conclude my answer. The impact on Mr. Graves is two-fold. One, it's clear that it was dry in 1979, so that there was no water. Now, the record does not agree whether it was croppable at that time. I would make that argument, I'm sorry. The impact on Mr. Graves, though, is that there was substantial testimony from him on the erodibility of the upland portions. If Mr. Graves were to try to farm the upland portions of his property, the tilling of that would cause material to come into the wetland. The increase in, and I believe that the EPA experts, there was substantial cross-examination on this point, the increased water table would cause a more highly erodible soil upland. And so that is the purpose. Of course, we have physical takings analysis. The sheer presence of the check dam could possibly have taken, regardless of the consequences. That would go to what level of compensation Mr. Graves would feel. All right. We'll hear from the Governor. Thank you, Your Honor. Ms. Brown, if you're here. Good morning, Your Honor. Shea, police report. My name is Tamara. I can't represent the United States. Where were you at 930 this morning? I was stuck in traffic, Your Honor. I started staying at a hotel uptown. I had no idea it would take as long as an indicator. I apologize. Well, it's a good thing to leave yourself a large cushion of time so that when traffic gets terrible, whether it's in Washington or New York or wherever, that counsel can be in time on court with assurance. I understand. I just had no idea how long that time would take. I believe the court understands fully the issue of involving consent to bring in this case and the consequences of the fact that Mr. Graves voluntarily accepted and agreed to each of the provisions in the decree. And to the extent that the court has any doubt on this issue, I refer the court to page 7 of the reply brief where Mr. Graves states that he viewed entering the consent decree as, quote, striking a deal. And one cannot strike a deal unless one has alternatives. Indeed, if the government was truly requiring, ordering, or commanding Mr. Graves to enter into the consent decree, he could not have struck a deal. If the government was requiring that he acquiesce to fiscal occupation of his land, he could not strike a deal. What kind of choice did he have? As stated by the court already, he had the option of going before the district court and arguing either that he should be assessed as low a penalty as possible or either that restoration was not required, that penalties were sufficient, or that minimal restoration was required. And then once EPA actually came to him and invited him to consider entering into a consent decree, he had even more options. One of which, as Judge Lori had indicated, was to reject the option of a consent decree outright. Or he could have accepted to enter a consent decree but negotiate on his terms. And indeed, ultimately, that's what he did in 1996. He decided this was a good deal. He entered into this option one day. And when the terms were ultimately decided, the consent decree was signed, and it was submitted to the district court. As of that time, he had now had knowledge of and had consented to each and every provision in the consent decree. And therefore, the actions taken under that consent decree, or the consequences flowing therefrom, cannot form the basis of a takings claim against the United States. Why don't you wrap it in a rule that every time you enter into a consent decree, you volunteer or defend, you're not going to stand in there to find yourselves in the regulatory table? If one enters into a consent decree and all the terms are spelled out, and in this case there might be a slight difference from the broader proposition you proposed, what was being required was bringing back conditions, for example, of saturation, pre-existing conditions. So here, not only are the actions known by Mr. Grayson, the action of the check down was known, the action of the fill was known, but the purpose was to make the wet lands wet again. And I'd just like to point out, in 1979, when they were dry, the only reason they were dry, and it was dry periodically, was because Mr. Grayson bought in the Clean Water Act and had pledged to fill that land to dry it. So we have a pre-existing condition here of being wet. But not awake. Again, I agree. Not awake. I agree with the Chief Judge. When you've got land that floods, and Mr. Grayson said in his testimony that the land did flood, that there were beaver dams there, he had flooding conditions. Now it's just a question of the degree to which it flooded, the degree to which we have ponding water. And we have no evidence presented by Mr. Grayson that the actions of which he agreed to and the government agreed to caused whatever degree of ponding that is supposedly on the land now. Is that a failure of the evidence that was submitted? Or is it a question of notwithstanding whether it was wetlands or a lake? The failure of the evidence is to show causation that the government, and actually, even if there were evidence that because of the restoration activities, there was flooding, Mr. Grayson agreed to conduct those activities, and he clearly knew when he conducted those activities his land, his wetlands would become wet again. Had the wetness gone to an extreme thereafter, he had options, as the trial court pointed out, to go back to the court, to go to EPA, to go to someone and say, I think this is a little too much water. This is more water than I had. That was never done. So why are we to find out that the amount of water that occurred after the restoration was unacceptable as compared to the amount of water that he experienced as a child all this time? This isn't a normal kind of taking situation. If the state government wants to build a road, and you want to cover it, and I don't assume, I don't contest it in the sense of acquiescence, of some kind of compensation for taking it, that's the kind of acquiescence that we need. And yet that doesn't disqualify the government's actions when they have taken it. That may be a type of acquiescence, but it is wholly and completely different from the circumstance here. Mr. Grayson did not sit back in his home and just say, I'll just wait and see what the government does. Or he didn't sit back and all of a sudden open his door and say, oh my goodness, look what the government is doing. It's different in another way, too. The government didn't physically take his money. Perhaps it was a regulatory taking. But it was more than that. There were cash penalties, monetary penalties. And he sort of settled that with civil penalties involved. So this isn't the usual kind of agreement to the taking. It's sort of settling the penalty issue, too. How does that play out? Well, the penalty element, I would agree, is unusual to takings cases now and then. I can't think of a case in which penalties were involved. But for all intents and purposes, I don't know that it ultimately matters. Because the bottom line is that each and every condition of which Mr. Grayson now complains was one that he knew of and one that he agreed to. And as to your statement that this might have been a regulatory taking, I just ask the Court to bear in mind the government never said, Mr. Grayson, you must use your land in this manner, X manner, and you do not have a choice. This is what you must do. That's a regulatory taking. That was not this case. Mr. Grayson, upon entering into consent to agree, struck a deal that he deemed acceptable. Well, the only problem I have with that is what he was told he was going to be required to do was to restore the 30 acres in question to the wetlands condition in which it was found prior to his dredging and filling and putting in drainage ditches, et cetera. But what he was actually told to do by EPA went beyond restoration and created a significant rise in the water table, which affected not only the 30 acres but apparently some of the nearby track. So maybe his consent only runs to restoration, and his consent doesn't run to changing the character of the 30 acres compared to what it was before he interfered with its natural state. If we assume that to be true, Your Honor, and there's nothing indicating that is the case, we have no evidence presented by Mr. Grayson as to the exact hydrological conditions that existed prior to the restoration. So we can't know the degree to which there was saturation or flooding or ponding. Is it disputed that the water table level rose significantly after restoration steps were taken? I believe there is a dispute because there is no evidence as to what degree of ponding or flooding existed prior and then post. I'm not asking about flooding per se. I'm using the water table measurement as the metric here. And I understood it to be undisputed that the water table rose significantly in the immediate aftermath of the completion of the so-called restoration steps. Your Honor, I- Well, if it went above, where is it going to go? I can't speak for certain as to whether that's disputed. I do know for a fact there's no evidence as to the level of the water table prior to the restoration and the level of the water table after. And indeed- I thought his testimony would count as evidence. Maybe he's fabricating it. He testified that the water table, from before he interfered with wetlands to after the restoration, saw a significant rise. Mr. Grace did testify to that. But I didn't see that there was any contrary evidence. Was there? Did he cite any contrary evidence that the water table didn't rise? Did he cite any contrary evidence? Did the government produce any evidence that he was wrong and that, in fact, the water table didn't rise? I don't believe the government had evidence of what the water table was on this land prior to the time of- Would you agree that if the water table did rise, would that suggest that what EPA required went far beyond restoration and actually created an expanded wetland compared to what had been there before he did the dredging and fill? Absolutely not. There's no evidence of the fact that the government's required. Again, there was no government required. Nor is there evidence that the agreement reached by the two parties, the government and Mr. Grace, at all contemplated that there would be more flooding than already existed. This instance was addressed in- and I will think of the case in a moment. But the court has pointed out that when the consequence goes beyond what was directly foreseeable to the government- let's just assume this was a government requirement- when the action goes- I thought it was on dispute that the restoration steps were drafted by EPA and that he agreed to them. But they were drafted by EPA. And it looked to me like they went way further than they should have. Well, clearly, they couldn't have. It simply required the installation of the check dam and some fill. That's all that was required. Nothing in the government said, we're going to make a bigger wetland than it had prior. Obviously, EPA is estimating that the check dam will not cause the condition of the land to be wetter than it was. That's absolutely correct. That's more- Or de-activated. Yeah. But apparently it did. As I said, if- So the check dam maybe was an excessive requirement. No, the check dam simply slows the flow of water so that the conditions of the wetlands can begin again. What it does is allow the water to flow more slowly. Vegetation says soil begins to form under saturated conditions, forming what's called hydrosoils. And that's what makes wetlands. Soil is formed in anaerobic, saturated conditions. So it simply just slows the flow of water. The bottom line is the government did not- The purpose of the government action in cooperation with Mr. Grayson was not to increase the amount of water on the land. And therefore, if that's not the government- That wasn't the direct purpose of the government's action, but it's an incidental consequence that wasn't foreseeable, then it doesn't- A table can't be established. I don't follow. A table can't be established? Why not? Because that- Compensation is owed when the government takes a direct action and requires someone to do something. If there's a consequence that wasn't foreseeable to what was required by the government, that doesn't constitute a taking. Why not? Why not? Well, let me change that. Suppose that as a result of the remediation steps EPA stipulated, that instead of 30 acres being under a pond, 60 acres were under a pond. Now, under your logic, the government still wouldn't be liable for taking. So you'd be claiming that they would be liable for taking not a 60 acres, but a 30, the excessive amount of wetlands created by the restoration. Perhaps under a different set of facts, it would be the case that there would be a taking. But here, there was no- Number one, there's no evidence that what we're discussing right now actually occurred. We don't have evidence that the government's request or proposal in coordination and cooperation with Mr. Grace necessarily and purposefully caused that there would be excessive length or excessive saturation. If there is more water, we don't know exactly how much, and we don't know how the pre-existing condition differs from the condition that Mr. Grace has now- So the intent of EPA can't save the day for the government, even if the EPA restoration plan designer didn't intend to flood 60 acres, if that's what their steps actually caused, it would be a taking. Well, perhaps, but there's no indication that that was the case here. And indeed, Mr. Grace participated in the terms, negotiating the terms of the proposal. It's not such that EPA said, this is it, this is our proposal, we have nothing to say about it. Mr. Grace did not sign until he determined that there were terms in the proposal that were acceptable to him. If I may just have a second, because Mr. Devlin spent so much time on the prior litigation, someone who came with the government has changed its position as to what's the relevant parcel in this case. May I just have just 30 seconds to address that? All right. The regulatory and statutory scheme in that case was entirely different, and the question was entirely different. Mr. Grace was seeking to qualify for an exemption from the wetlands to the permanent conditions of the Clean Water Act. The government's position was that Mr. Grace, for the relevant time period, you had not been using the wetlands for normal farming operations, which is the term of art under the Act. Therefore, in the process of determining which pieces of Mr. Grace's property could qualify for the exemption, the government said you can't include the wetlands. Because notwithstanding, Mr. Grace, your desire and your intent to farm the wetlands portion, when you first clawed down your 34-acre parcel, for the relevant time period, you have not been actively farming. And indeed, that's why you're seeking an exemption, so that you may farm it. So it was simply under the circumstances of that case that the government was saying, for exemption purposes, the wetlands should be included. But that does not apply to the parcel at all. All right. Thank you. Mr. Chairman, we'll restore two minutes of your rebuttal time. Your Honor, thank you very much. Very briefly, Your Honor, just to raise a couple of points with respect to whether or not the check in on any half-caused excessive wetland. I believe record page A521, the cross-examination testimony of Mr. Lapp, one of the EPA's witnesses. He acknowledges in talking about whether or not EPA would be willing to change any of the terms in the restoration plan. Mr. Lapp testified earlier that he was the person who drafted the restoration plan. He indicated that he would not be willing to change any of the terms. And that states that the only issue may be the check date. He then goes on to explain what the purpose of the check dam was, and experiences with counsel's indication, but indicated that that could go beyond, that the check dam could have created a problem. So again, the evidence is that Mr. Dory testified that the water table went up. There was no contrary evidence to indicate any other cause for that other than the restoration efforts. And the EPA acknowledges that the check dam, if there is any problem, the check dam could have caused it. Mr. Devlin, was it incumbent upon you to present evidence as to what it was before the remediation plan was implemented, and subsequently what caused it, what caused the actual flooding of the property? Well, Your Honor, I believe that Mr. Grace testified temporally to that. And again, he acknowledged that there was no expert testimony on this point. But Mr. Grace did go on from, and the time periods are very relevant, really. From 1977 until 1984, none of that was part of the enforcement action. Mr. Grace had done that under the assistance of the government. There was never an argument that he violated the Clean Water Act up until 1984. And we know the trial court found in the 3rd Circumstance that by 1979 the property was dry. Mr. Grace then in 96 engaged in these restoration efforts that are designed to bring back a hydrologic regime. And the water table begins to rise. So I am not at all conceding that the expert testimony on that point is necessary. Mr. Grace's testimony that the water table increased after putting in a dam and filling up drainage ditches is substantial testimony to the causation. All right. The time has expired. Thank you both counsel.  Thank you, Your Honor.